UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| Joseph F. Roberts and Dorothy L. Roberts, | ) | Case No. 19bk06272 |
| | ) | |
| Debtors. | ) | Chapter 13 |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| Aire Serv LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 19ap00587 |
| | ) | |
| Joseph F. Roberts, | ) | Judge Timothy A. Barnes |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

TIMOTHY A. BARNES, Judge

## MEMORANDUM DECISION

This matter comes before the court on the Amended Adversary Complaint Seeking Injunctive Relief [Adv. Dkt. No. 3] (the "Amended Complaint") and the Motion for Preliminary Injunction [Adv. Dkt. No. 6] (the "Motion") brought by the plaintiff Aire Serv LCC ("Aire Serv") against the defendant-debtor Joseph F. Roberts ("Joseph").

For the reasons set forth more fully below, upon review of the respective filings, the court concludes that Aire Serv's rights under the covenant not to compete in the Franchise Agreement (as defined below), including to injunctive relief, constitute a "claim" within the meaning of 11 U.S.C. § 101(5), which claim will be treated in accordance with bankruptcy law. The court further concludes that Aire Serv has no cause or right of action against Joseph under the covenant not to compete in the Confidentiality Agreement (as defined below). Aire Serv is therefore unlikely to succeed on the merits of its claims for a permanent injunction, the only relief sought in the Amended Complaint, and the Motion is therefore not well taken and will be denied.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the

Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy judge may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, the bankruptcy court must also have constitutional authority to hear and determine a matter. *See Stern v. Marshall*, 564 U.S. 462 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) (parties may consent expressly or impliedly to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

In the Response to Plaintiff's Motion for a Preliminary Injunction [Adv. Dkt. No. 13] (the "Response"), Joseph appears to challenge the court's authority to enter final orders in this adversary proceeding. *See* Resp., at p. 4.[1] This appears to be a so-called *Stern* challenge. *KHI Liquidation Tr., Inc. v. Wisenbaker Builder Servs., Inc. (In re Kimball Hill, Inc.)*, 480 B.R. 894, 898 (Bankr. N.D. Ill. 2012) (Barnes, J.)

As noted by this court in *Wisenbaker* shortly after the *Stern* decision was issued, *Stern* objections have become a form over substantive devise used by "strategic-minded defendants who have sought to use *Stern* to prolong and/or obfuscate litigation." *Id.* (full internal citation omitted). Like most *Stern* challenges of this nature, Joseph cites no statute, case or rule that supports his position, nor does he clarify whether his is a challenge to this court's jurisdiction, statutory authority or constitutional authority.

The court finds Joseph's *Stern* challenge to be disingenuous at best and legally deficient at worst. Joseph commenced this bankruptcy case, putting all of his affairs—including contractual disputes—before the court. Joseph scheduled Aire Serv as a creditor and noted the nature of the debt as a lawsuit. Official Form 106E/F, Creditors Who Have Unsecured Claims at 4.1 (contained in Official Form 101, Voluntary Petition for Individuals Filing for Bankruptcy [Case No. 19bk06272, Dkt. No. 1] (the "Petition")); Official Form 107 at p. 9 (also contained in the Petition). For Joseph

---

[1]    The court extrapolates page numbers for the Response as Joseph failed to comply with the Local Rules of the Bankruptcy Court for the Northern District of Illinois (the "Local Rules") and consecutively number the pages of the Response. *See* Local Bankr. R. 5005-3(C)(7).

to challenge the ability of this court to determine a creditor's request to enforce the terms of a contract in Joseph's own, voluntary bankruptcy case is disingenuous.

It is also legally deficient. Recent amendments to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") have added a specific mechanism for bringing *Stern* challenges in adversary proceedings. Bankruptcy Rule 7012 provides that "[a] responsive pleading shall include a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy court." Fed. R. Bankr. P. 7012(b). This is an addendum to the requirements of Rule 12 of the Federal Rules of Civil Procedure (the "Civil Rules"), made applicable in adversary proceedings by Bankruptcy Rule 7012, which requires defenses to be set forth in responsive pleadings or a motion under that Rule. *See* Fed. R. Civ. P. 12(b). Failure to assert defenses in accordance with the rules constitutes waiver of those defenses. *See* Fed. R. Civ. P. 12(h).

Joseph's Response is neither a responsive pleading nor a motion under Civil Rule 12(b). As such, his defense is waived, Fed. R. Civ. P. 12(h); *Trs. of Cent. Laborers' Welfare Fund v. Lowery*, 924 F.2d 731, 732 (7th Cir. 1991), and he has impliedly consented to the entry of final orders by the court in this adversary proceeding. *Wellness*, 135 S. Ct. at 1944–47 (2015) (implied consent constitutionally sufficient for entry of final orders by bankruptcy court), *remanded to* 617 F. App'x 589, 590 (7th Cir. 2015) (failure by a party to properly raise its lack of consent according to applicable rules forfeited the point); *Richer*, 798 F.3d at 490. Aire Serv has, of course, by invoking this court's jurisdiction by filing the Amended Complaint, also consented to the entry of final orders.

The court has original but not exclusive jurisdiction over this matter under 28 U.S.C. § 1334(b) as a matter arising in or related to a case under the Bankruptcy Code. Further, the court has statutory authority to hear the matter under 28 U.S.C. § 157(b)(1) as a matter that affects the administration of Joseph's bankruptcy estate and claim against the bankruptcy estate. 28 U.S.C. §§ 157(b)(2)(A), (B). Finally, as noted above, the parties have waived objections to or impliedly or explicitly consented to this court's constitutional authority over the matter.

The court therefore concludes that resolution of the matters presented herein is within the scope of the court's jurisdiction, statutory authority and constitutional authority.

## PROCEDURAL HISTORY

In addition to reviewing the Amended Complaint, the Motion and the Response, and any and all exhibits submitted in conjunction therewith, the court has considered the arguments of the parties at the hearing held on July 18, 2019 (the "Hearing") and has reviewed and considered the following documents:

(1)   Adversary Complaint Seeking Injunctive Relief [Adv. Dkt. No. 1] (the "Complaint");

(2)   Affidavit of Peter J. Dotson [Adv. Dkt. No. 16] (the "Dotson Affidavit");

(3)   Plaintiff's Reply in Support of Its Motion for Preliminary Injunction [Adv. Dkt. No. 17] (the "Reply");

(4)   Plaintiff's Supplement Argument in Support of Its Motion for Preliminary Injunction [Adv. Dkt. No. 26] (the "Supplemental Reply"); and

(5)     Response to Plaintiff's Supplemental Argument in Support of Plaintiff's Motion for a
Preliminary Injunction [Adv. Dkt. No. 27] (the "Supplemental Response").

The court has taken into consideration any and all exhibits submitted in conjunction with the
foregoing. Though these items do not constitute an exhaustive list of the filings in this adversary
proceeding, the court has taken judicial notice of the contents of the docket in this case. *See Levine v.
Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy
court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill.
1989) (Goldgar, J.) (recognizing same).

Having conducted such review, this Memorandum Decision constitutes the court's
determination of the Motion.

## BACKGROUND

The matter before the court arises from a failed franchise relationship, the resulting litigation
and certain related prepetition and postpetition events described in Parts A and B below. Certain
relevant terms of the agreement governing the franchise arrangement are reproduced and discussed
in Part C below. Unless noted otherwise, neither party appears to dispute the following factual
underpinnings of the Amended Complaint and the Motion.

A.     Prepetition Events

From 2002 to 2017, Joseph and his business associate Earl D. Stoxstell ("Earl") operated an
HVAC-repair business via a now-dissolved corporation J.S.R. Heating and Cooling, Inc. ("JSR") as
Aire Serv's franchisee. Am. Compl., at pp. 1, 4–5, 7–9. On January 20, 2012, Aire Serv and JSR
renewed an initial ten-year franchise relationship by entering into the franchise agreement attached
to the Amended Complaint and the Motion. Am. Compl., Exh. A [Adv. Dkt. No. 3-1]; Mot.,
Exh. A [Adv. Dkt. No. 6-1] (the "Franchise Agreement").

The Franchise Agreement, among other things, allowed JSR to use Aire Serv's systems,
marks and other business assets to operate an HVAC-repair business in a territory covering portions
of Cook, Will and Kankakee Counties in exchange for certain fees and various nonmonetary
obligations. *See generally* Franchise Agreement, at pp. 1–16; *id.*, Exh. 1C (defining the franchise
territory). The Franchise Agreement contains a guaranty promise whereby Joseph and Earl agreed
to be bound by the same terms as JSR under the Franchise Agreement. Franchise Agreement, at
p. 36 (the "Guaranty"). In conjunction with the Franchise Agreement and Guaranty, Joseph and his
wife Dorothy L. Roberts, also a debtor in the bankruptcy case associated with this adversary
proceeding ("Dorothy" and collectively with Joseph, the "Debtors"), executed a confidentiality
agreement that imposes nondisclosure and other related obligations on Dorothy as an associate of
Joseph and JSR. Franchise Agreement, Exh. 7A (the "Confidentiality Agreement" and collectively
with the Franchise Agreement and the Guaranty, the "Agreements"). Earl and his wife Mary
Stoxstell ("Mary") also executed a substantively identical confidentiality agreement applicable to
Mary in like manner. *See* Franchise Agreement, Exh. 7B. The relevant terms and provisions of the
Agreements are reproduced and discussed in more detail in Part C below.

On August 29, 2017, Aire Serv terminated the franchise relationship, stating that JSR had
failed to timely comply with certain audit obligations and had defaulted on royalty payments under

4

the Franchise Agreement. Mot., Exhs. B–G [Adv. Dkt. Nos. 6-2 to 6-7] (correspondence from the initiation of the audit to the termination of the franchise); Am. Compl., at pp. 7–9; Mot., at pp. 4–5. After the termination of the franchise relationship, JSR, and later Joseph individually, have allegedly continued to operate an HVAC-repair business within the former franchise territory in violation of certain covenants not to compete in the Franchise Agreement and the Confidentiality Agreements. Am. Compl., at pp. 9–10; Mot., at pp. 5–7.

On September 28, 2018, over a year after the termination of the franchise arrangement, Aire Serv filed a suit[2] in the District Court for the Northern District of Illinois seeking injunctions to enforce the covenants not to compete in the Franchise Agreement and Confidentiality Agreements against JSR, the Debtors and Earl and Mary. Complaint [Prepetition Suit, Dkt. No. 1]. On October 16, 2018, however, the Debtors filed for chapter 13 relief, thereby commencing the Debtors' first chapter 13 case in the past year.[3] Official Form 101—Voluntary Petition for Individuals Filing for Bankruptcy [Prior Case, Dkt. No. 1]. In response to the Debtors' bankruptcy filing, the District Court dismissed the Debtors from the Prepetition Suit without prejudice on November 6, 2018, and in December 2018 Aire Serv voluntarily dismissed JSR due to its dissolution. Am. Compl., at p. 3. The Prepetition Suit was then resolved as to the remaining defendants, Earl and Mary, by the entry of a consent decree on January 3, 2019. Consent Decree [Prior Case, Dkt. No. 31]. On February 7, 2019, the Prior Case was dismissed for unreasonable delay. Order Dismissing Case for Unreasonable Delay [Prior Case, Dkt. No. 35-1].

After the resolution of the Prepetition Suit and the dismissal of the Prior Case, Aire Serv conducted a "sting" operation to determine whether Joseph was operating a competing business within the former franchise territory in violation of the covenants not to compete. *See* Am. Compl., at pp. 9–10; Mot., at pp. 6–7. According to Aire Serv, that investigation, conducted on February 21, 2019, revealed that Joseph was apparently still operating a competing HVAC-repair business within the former franchise territory. Dotson Aff., at ¶¶ 2–13; *see also* Am. Compl., at pp. 9–10; Mot., at pp. 6–7. In the Dotson Affidavit, made by the private investigator, Peter Dotson ("Dotson"), whom Aire Serv hired to conduct the sting operation, Dotson states that he called the phone number associated with the former franchisee JSR to request HVAC-repair services and received a return call from Joseph, who identified himself as the owner of JSR and scheduled an appointment with Dotson. Dotson Aff., at ¶¶ 2–5, 7. Joseph arrived for that appointment in the same van he had used while operating JSR as Aire Serv's franchisee and approached the address with what appeared to be his work tools, but Dotson called to reschedule (in effect cancel) the appointment before Joseph performed any work. *Id.* at ¶¶ 9–12.

---

[2]    *Aire Serv LLC v. J.S.R. Heating & Cooling, Inc.*, Case No. 18cv06629 (N.D. Ill. filed Sept. 28, 2018) (Chang, J.) (the "Prepetition Suit").

[3]    *In re Joseph & Dorothy Roberts*, Case No. 18bk29118 (Bankr. N.D. Ill. filed Oct. 16, 2018) (Barnes, J.) (the "Prior Case").

B.   Postpetition Events

On March 8, 2019 (the "Petition Date"), a month after the dismissal of the Prior Case, the Debtors filed a second chapter 13 case,[4] which is still pending before the court.  Pet.

Thereafter, on March 28, 2019, Aire Serv commenced this adversary proceeding against the Debtors by filing a complaint adapted from the complaint from the Prepetition Suit for use in this adversary proceeding.  *Compare* Compl. *and* Am. Compl. *with* Complaint [Prepetition Suit, Dkt. No. 1].[5]  The gravamen of the Amended Complaint is that Joseph has continued to operate a competing HVAC-repair business postpetition in the former franchise territory in violation of the covenants not to compete in the Agreements.  Am. Compl., at pp. 9–10.  The Amended Complaint seeks only injunctive relief against Joseph and sets forth three grounds for sets for relief: (1) the breach of the covenant not to compete in the Confidentiality Agreement; (2) the breach of covenant not to compete in the Franchise Agreement; and (3) the misappropriation of trade secrets.  Am. Compl., at pp. 10–14.[6]  The Amended Complaint seeks no money damages.  *Id.*

A few weeks after filing the Amended Complaint, Aire Serv brought the Motion now before the court.  The Motion seeks a preliminary injunction, without having first sought a temporary restraining order, against Joseph alone, to restrain him from operating his HVAC-repair business while this adversary proceeding is pending.  Mot., at pp. 1, 8–9.  The Motion generally contains the same factual allegations as the Amended Complaint and relies on the prepetition, February 21, 2019 sting operation as evidence that Joseph is continuing to operate his HVAC-repair business within the former franchise territory postpetition.  *Compare* Mot., at pp. 2–7 *with* Am. Compl., at pp. 4–10.  Aire Serv asserts that a preliminary injunction is warranted because: Aire Serv will likely succeed on the merits, *i.e.*, will likely obtain the permanent injunction sought in the Amended Complaint, Mot., at pp. 8–10, Reply, at p. 6; Aire Serv will suffer irreparable harm in the meantime if Joseph is not enjoined from operating his business while this adversary proceeding is pending, Mot., at pp. 12–13; and such harms suffered *pendente lite* could not be remedied after the fact via money damages in a judgment in Aire Serv's favor, Reply, at pp. 4–5.

For evidentiary support, the Motion relies mainly on a missing affidavit abbreviated as the "Truett Aff." in citations thereto in the Motion.  *See, e.g.*, Mot., at p. 2.  No such affidavit was attached to the Motion or otherwise filed in this adversary proceeding, though Aire Serv did later file

---

[4]   *In re Joseph & Dorothy Roberts*, Case No. 19bk06272 (Bankr. N.D. Ill. filed Mar. 8, 2019) (Barnes, J.) (the "Main Case").

[5]   The Amended Complaint, filed on April 1, 2019, removed Dorothy as a defendant, but otherwise appears substantially similar to the Complaint, including some remaining references to the Debtors, plural, in the operative language of the Amended Complaint. *Compare* Compl., at pp. 1, 10–14 *with* Am. Compl., at pp. 1, 10–14.

[6]   The Motion requests a preliminary injunction based only on the Agreements, which are raised in the first two counts of the Amended Complaint. The only argument made by Aire Serv as to misappropriation, which is raised as a basis for a permanent injunction in the third count of the Amended Complaint, appears in one line of the Motion and is made in a conclusory manner and with no support. *See* Mot., at p. 12. The court, therefore, will only address the grounds for a preliminary injunction raised by Aire Serv in the Motion.

a different affidavit, the Dotson Affidavit, with the Reply.[7] The other evidence submitted by Aire Serv with the Motion consists of documents described as exhibits to the missing affidavit, which include, in addition to the Agreements themselves: the correspondence from Aire Serv and its auditor to JSR and Joseph through the notice of default and notice of termination; photographs or video stills taken as part of the February 21, 2019 sting operation and showing the JSR storefront and van; and undated printed copies of third-party, consumer-facing websites with information and reviews of JSR. *See* Mot., Exhs. B–G (correspondence through notice of termination), Exh. H (photographs), Exh. I (printed copies of third-party websites).

In the Response, Joseph has conceded generally that he is continuing to operate an HVAC-repair business postpetition, that the covenant not to compete in the Franchise Agreement is valid and enforceable against Joseph and that Joseph is likely in violation of such covenant. Resp., at p. 5. Joseph contends, however, that Aire Serv cannot show the requisite likelihood of success on the merits of its claims because Aire Serv's alleged right to equitable relief of any kind under the Agreements against Joseph is a claim against Joseph's bankruptcy estate pursuant to 11 U.S.C. § 101(5)(B), as governed by *In re Udell*, 18 F.3d 403 (7th Cir. 1994). Resp., at pp. 3–4. According to Joseph, that means that Aire Serv must now assert any right to equitable relief against Joseph (or Dorothy) not in an adversary proceeding or other plenary suit, which Joseph appears to contend would violate the automatic stay, but instead via a proof of claim and the claims allowance process in the Main Case, *i.e.*, in the same manner Aire Serv may seek to collect postpetition on any damages claim it may have against the Debtors. *See id.* In particular, Joseph points to a liquidated damages provision in the Franchise Agreement's covenant not to compete that allegedly provides an alternate damages remedy to the injunctive relief sought by Aire Serv. *Id.* Joseph also argues that applicable nonbankruptcy law would allow for an award of money damages as alternative to an injunction on the facts of the Amended Complaint. *Id.*

Joseph asserts in the alternative that even if Aire Serv does not have a claim against Joseph on account of its alleged right to equitable relief, and even though Joseph agrees he is currently violating the Franchise Agreement's covenant not to compete, Aire Serv has failed to show irreparable harm *pendente lite* and the lack of an adequate legal remedy. *See id.* at pp. 5–6. Specifically, Joseph argues that Aire Serv has failed to submit sufficient evidence of the harms it alleges and that applicable nonbankruptcy law allows for money damages as an alternative to equitable relief to remedy violations of the covenants not to compete. *See id.* Joseph also asserts that the balance of the harms falls in his favor because enforcing the covenants not to compete would allegedly deprive him of any ability to earn a living. Last, Joseph argues that the public interest favors enabling Joseph to proceed with his proposed chapter 13 plan in the Main Case. *See id.* at p. 6.

After an initial round of briefing, which included the grant of an extension of time requested by Aire Serv, the court held the Hearing, at which counsel for the parties appeared and presented oral argument. *See* Order [Adv. Dkt. No. 11] (order entered May 2, 2019 after first hearing on the Motion setting a briefing scheduling with oral argument on June 13, 2019); Plaintiff's Motion to Extend Time [Adv. Dkt. No. 15]; Order Granting Plaintiff's Motion for Extension of Time [Adv.

---

[7]      The Dotson Affidavit and the missing affidavit appear to be different documents and to have differing factual content, albeit with some overlap. Many of the factual propositions in the Motion for which Aire Serv cites to the missing affidavit do not appear in the Dotson Affidavit and the Dotson Affidavit has only thirteen paragraphs, whereas citations to the missing affidavit in the Motion refer to higher-numbered paragraphs. *See, e.g.*, Mot., at p. 4 (citing to paragraph 16 of the missing affidavit).

Dkt. No. 21]. The Hearing focused on whether Aire Serv must pursue its claims for equitable relief against Joseph in the Main Case. The court also questioned counsel for Aire Serv regarding, *inter alia*, the timing of the two-year term of the covenants not to compete and whether that term would run on August 29, 2019, two years from the date of the termination of the franchise relationship under the Franchise Agreement. In response, the parties sought and the court allowed a supplemental round of briefing on tolling the term of the covenants not to compete. Order [Adv. Dkt. No. 25].

In the Supplemental Reply, Aire Serv argues that the language of the covenants not to compete in the Franchise Agreement and the Confidentiality Agreement, or in the alternative applicable nonbankruptcy law, enables the tolling of extension of the term of the such covenants. *See* Supp. Reply, at pp. 1–4. Joseph asserts in response that the language in the Franchise Agreement's covenant not to compete is ambiguous at best on tolling, that the Confidentiality Agreement applies only to Dorothy and not Joseph and that tolling would not be equitable here as Aire Serv waited over a year to bring suit and was the cause of much of the delay in this adversary proceeding. *See* Supp. Resp., at pp. 1–3.

Following the Hearing, the court took the matter under advisement, pending receipt of the supplement briefs, with a status on August 22, 2019 and a written opinion to follow. With the timely submission of the supplemental briefing and the oral argument held at the Hearing, the matter is now fully briefed and argued.

C.     Relevant Contractual Provisions

The Franchise Agreement's covenant not to compete, contained in section 9 of the Franchise Agreement, provides in pertinent part as follows:

> 9.3     **In-Term & Post-Term Covenants**. . . . Franchisee . . . covenants and agrees that:
>
>     . . .
>
>     9.3.2     Franchisee shall not, directly or indirectly, as a proprietor, partner, investor, shareholder, member, director, officer, employer, employee, principle, agent, adviser, franchisor franchisee, or in any other individual or representative capacity or otherwise for a period of two (2) years immediately following the later of the expiration, termination or non-renewal of this Agreement for any reason whatsoever or the date on which Franchisee actually ceases operation of the business:
>
>         9.3.2.1     engage in or participate in or derive benefit from a Competitive Business located (i) in the Territory, or (ii) in the territory of another of Franchisor's franchisees. . . . or
>
>         9.3.2.2     employ, seek to employ or otherwise induce any person to leave his employment who is then employed by any other franchisee or by Franchisor, unless, in the case of any employee of Franchisor, Franchisee has obtained Franchisor's prior written consent and paid [certain reasonable training fees] . . . or

9.3.2.3    interfere with any of the business relationships and/or advantages of Franchisor or any other franchisee; or

9.3.2.4    use any Confidential Information whatsoever in any manner which is or is intended to be damaging or derogatory or hinder the relationship of Franchisor with its other franchisees, customers, suppliers or the relationship of any other franchisee with its customers or supplier; or

9.3.2.5    divert or attempt to divert any customer business from franchisor or any other franchisee or solicit or endeavor to obtain business of any person who shall have been a customer of Franchisee's Franchised Business.

9.4    **Liquidated Damages**. If Franchisor establishes that Franchisee has violated the material terms of this Section 9 [the covenant not to compete] and such provisions are not enforceable by equitable relief for any reason, Franchisee agrees that Franchisor will incur certain damages and costs that are not readily ascertainable. Therefore, in such event, Franchisee shall pay to Franchisor, as liquidated damages and not as a penalty, a sum of money equal to 104 times the largest weekly License Fee paid by Franchisee to Franchisor during the term of this Agreement. For purposes of this Section, if Franchisee has failed and/or refused to report Gross Sales, the parties agree that Franchisor may estimate a reasonable amount of License Fee and Franchisee shall be bound by Franchisor's estimate. Payment of such sum by Franchisee shall be due immediately upon demand by Franchisor after Franchisee's violation of the terms of this Section 9 and Franchisor's inability to obtain equitable relief for any reason. Franchisor and Franchisee both agree that the amount established in this Section 9.4 as liquidated damages is reasonable under the circumstances existing at the time of execution of the Agreement.

Franchise Agreement, at pp. 18–20.[8] The Franchise Agreement also imposes additional post-termination obligations whereby JSR upon termination was required to stop using and return to Aire Serv the various property interests and other rights granted or licensed under the Franchise Agreement. *See id.*, at pp. 26–27.

---

[8]    The Franchise Agreement defines "Franchisor" as Aire Serv and "Franchisee" as JSR. Franchise Agreement, Exh. 1A, at p. 1; *id.*, Exh. 1C, at p. 1. "Franchised Business" means "[t]he business that utilizes [Aire Serv's proprietary system(s)] to offer and sell [certain HVAC-installation, maintenance and repair services]." Franchise Agreement, Exh. 1A, at p. 1. In turn, "Competitive Business" is defined as "[a]ny business other than the Franchise which offers or sells any product or service or component thereof which composes a part of Franchisor's System or which competes directly or indirectly with the Franchise or Franchisor's System . . . ." *Id.* at p. 5. "Confidential Information" is defined as "[a]ny information, knowledge or know-how concerning [Aire Serv's proprietary system(s)] which Franchisor designates as confidential." *Id.* The "License Fee" referenced in the liquidated damages clause refers to the primary royalty obligation due under the Franchise Agreement and calculated as a percentage of weekly gross receipts. *Id.* at p. 3. The Franchise Agreement contains a choice of law clause in favor of Texas law to the extent not inconsistent with Illinois law. *Id.* at p. 29; *id.*, Exh. 15, at p. 1.

The Guaranty in the Franchise Agreement provides as follows:

> Each of the undersigned [Joseph and Earl] acknowledges and agrees as follows:
>
> Each has read the terms and conditions of the [Franchise] Agreement and acknowledges that the execution of this Guaranty is a condition to the granting of the Franchise for operation of the Franchised Business, and that Franchisor would not have granted this license without the execution of this Guaranty and such undertakings. Each individually, jointly and severally, makes, accepts and agrees to all of the provisions, covenants, conditions, representations, warranties and agreements set forth in the [Franchise] Agreement and is obligated to perform thereunder. Further, each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the [Franchise] Agreement will be punctually performed and/or paid. Upon default by Franchisee or upon written notice from Franchisor, each will make payment and/or perform each obligation of Franchisee under the [Franchise] Agreement.

Franchise Agreement, at p. 36.

The Confidentiality Agreement contains the following covenant not to compete, in pertinent part:

> Except as otherwise approved in writing by Franchisor . . . for a period of two (2) years, commencing with the earlier of the termination of the Franchise Agreement or the date on which Associate cease to be associated with Franchisee (or the individual who is the principal of a legal entity identified as Franchisee), whether because of the later to occur of a termination of an employment arrangement or marriage, which period shall be extended by any period of non-compliance, Associate shall not, directly or indirectly, through, on behalf of, or in conjunction with, any other person, partnership, or legal entity, own, maintain, operate, or engage or participate in, or have any financial interest, either as an officer, agent, employee, principal, partner, director, shareholder or any other individual or representative capacity, in any corporation, partnership or legal entity which engages in any business which is the same or similar to the Franchise, or is otherwise in competition with the business of Franchisor or Franchisor's geographical area specified in Exhibit 1C of the Franchise Agreement.

Confidentiality Agreement, at p. 2.[9]

## DISCUSSION

Below, in Part A, the court first discusses the standards on a preliminary injunction and the law applicable to the interpretation and application of the Agreements. After having done so, the

---

[9]     The term "Franchisor" is defined as in the Confidentiality Agreement to mean Aire Serv, while "Franchisee" for purposes of the Confidentiality Agreement means Joseph and "Associate" means Dorothy. Confidentiality Agreement, at p. 1. The Confidentiality Agreement also contains a choice of law clause in favor of Texas and allow cumulative damages and equitable relief to enforce the nondisclosure provisions therein. *Id.* at p. 2.

court then considers whether such standards are met with respect to the covenant not to compete in the Franchise Agreement and the covenant not to compete in the Confidentiality Agreement.

As to the Franchise Agreement's covenant not to compete, the court in Part B examines whether Aire Serv is likely to succeed on the merits to obtain specific performance of such covenant. The court first takes up the gating question of whether the term of such covenant, which has already expired, can be extended. Aire Serv would face considerable difficulty at trial in extending such covenant's term, but given the complexities involved in the extension analysis, the court examines whether Aire Serv has otherwise established that it is likely to succeed on the merits under such covenant. Aire Serv has not so established, as its claims under such covenant constitute a claim under 11 U.S.C. § 101(5) that must be asserted in the Main Case and not by way of an adversary proceeding.

With respect to the Confidentiality Agreement's covenant not to compete, as set forth in Part C, Aire Serv has also failed to establish a likelihood of success on the merits, but for a different reason than the covenant not to compete in the Franchise Agreement. The Confidentiality Agreement's covenant not to compete does not apply to Joseph, but rather only to Dorothy. Only Joseph is a defendant in this adversary proceeding. Aire Serv therefore has no claim under the Confidentially Agreement's covenant not to compete against the only defendant named in the Amended Complaint.

Finally, Aire Serv also has not met its burden to show irreparable harm *pendente lite* in the absence of a preliminary injunction and the inadequacy of its legal remedies, for the reasons set forth below, in Part D. Accordingly, the Motion is not well taken with respect to the Franchise Agreement's covenant not to compete and the Confidentiality Agreement's covenant not to compete.

A.     Standards and Applicable Law

1.     *Preliminary Injunction Standards*

"A preliminary injunction is an extraordinary remedy that is only granted where there is a clear showing of need." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

To determine whether a preliminary injunction should be granted, courts consider five factors. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 385–88 (7th Cir. 1984). A plaintiff bears the initial burden on the first three factors, which include: the likelihood of success on the merits of the plaintiff's claims; irreparable harm to the plaintiff if the preliminary injunction is denied; and the lack of any adequate remedy at law. *Id.* If the threshold showing is made by the plaintiff on the first three factors, the burden then shifts to the defendant on the last two: balance of the harm to plaintiffs if the preliminary injunction were wrongfully denied as against the harm to the defendant if the injunction were wrongfully granted; and the impact on persons not directly concerned in the dispute, or the public interest. *Id.*; *see also Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998).

In a proceeding for preliminary relief, such as a temporary restraining order or preliminary injunction, the court has discretion to consider hearsay and various other normally-inadmissible

materials, documents and statements because the Federal Rules of Evidence apply differently in a proceeding on a motion for a preliminary relief. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) (affidavit that would be inadmissible at trial could be considered in a summary proceeding such as a proceeding on a preliminary injunction motion); *S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) (inadmissible hearsay can likewise be considered on a preliminary injunction). Accordingly, the findings and conclusions made in resolving a preliminary injunction motion are not binding on the merits. *Camenisch*, 451 U.S. at 395. The burden on the party seeking a preliminary injunction, however, is still an evidentiary burden and a preliminary injunction may not issue except on a clear showing that the preliminary injunction is necessary and the elements therefor satisfied. *Mazurek*, 520 U.S. at 972.

### 2.    *Choice of Law*

Texas law governs the interpretation and construction of the Franchise Agreement and the Confidentiality Agreement in this adversary proceeding, because the Agreements contain choice of law clauses in favor of Texas. Franchise Agreement, at p. 29; Confidentiality Agreement, at p. 2. These choice of law clauses are enforceable under both Illinois and federal choice of law rules and the parties do not appear to dispute that Texas law is the applicable nonbankruptcy law herein; accordingly, there is no actual conflict of law on the question of whether to enforce the choice of law clauses in the Agreements. Texas law applies to the construction and application of the Agreements in accordance with such choice of law clauses. *See Jafari v. Wynn Las Vegas, LLC (In re Jafari)*, 569 F.3d 644, 649–52 (7th Cir. 2009); *Jones v. Bailey (In re Morris)*, 30 F.3d 1578, 1581–82 (7th Cir. 1994).

Of course, federal law continues to govern questions of bankruptcy law and the standard for granting a preliminary injunction under Civil Rule 65, as made applicable by Bankruptcy Rule 7065.

### B.    Likelihood of Success on the Merits Under the Franchise Agreement's Covenant Not to Compete

To decide whether preliminary injunctive relief is warranted with respect to the Franchise Agreement's covenant not to compete, the court must first determine whether Aire Serv is likely to succeed on the merits of its claim for specific performance of such covenant.

### 1.    *Term of the Franchise Agreement's Covenant Not to Compete*

As discussed above, following the Hearing on the Motion, the court ordered supplemental briefing, as the express term of such covenant appeared on its face to expire in short order. The Franchise Agreement provides that the term of its covenant not to compete will be: "for a period of two (2) years immediately following the later of the expiration, termination or non-renewal of this Agreement for any reason whatsoever *or the date on which Franchisee actually ceases operation of the business*[.]" Franchise Agreement, at p. 19 (emphasis added). Aire Serv terminated the franchise relationship on August 29, 2017. Mot., Exh. G [Adv. Dkt. No. 6-7]. As such, but for the italicized language, it appears that the term of the Franchise Agreement's covenant not to compete has now expired. Such term expired on August 29, 2019, two years from the date of the termination of the

franchise relationship, unless the italicized portion of the quoted language applies to the facts in the Amended Complaint or such term can otherwise be equitably extended.

The italicized portion of the quoted language appears to effect some sort of tolling, but is ambiguous. Does the italicized language mean (a) the date on which JSR (and Joseph, the only defendant in the Amended Complaint) actually stop operating a business as Aire Serv's franchisee, which date as a practical matter may not correspond precisely with the date of the termination of the franchise relationship under and according to the Franchise Agreement, or (b) the date on which JSR (and Joseph) actually stop operating a competing business in violation of the covenant not to compete? The ambiguity can be understood by substituting two defined terms used in the Franchise Agreement for the word "business" in the italicized language above. The term "Franchised Business" is defined to mean a business operating as a franchisee under the Franchise Agreement, while the term "Competitive Business" is defined as a business in competition with Aire Serv or its franchisees, including a former franchisee violating the covenant not to compete. *See* Franchise Agreement, Exh. 1A, at pp. 1, 5; *see also id.* at p. 19 (provisions in the covenant not to compete prohibiting participation in or deriving benefit from a "Competitive Business").

The former reading, in which "business" is replaced by the "Franchised Business" or has a similar meaning, would prevent the term of the covenant not to compete from beginning to run earlier than termination if, for example, the termination is due to the improper cessation of operations as a franchisee under the Franchise Agreement (as termination is not made automatic in such cases). *See id.* at pp. 24–25 (non-exhaustive list of grounds for termination upon notice); *see also id.* at pp. 23–24 (automatic termination without notice). Such a reading would also arguably toll the covenant not to compete until after a (former) franchisee has finished complying with its short-term post-termination obligations under the Franchise Agreement. *See id.* at pp. 26–27. Under this reading, however, the tolling language, though likely reasonable, would offer Aire Serv no aid on the present facts.

By contrast, the second option is preferred by Aire Serv because it would effectively extend the term of the covenant not to compete for however long violations thereof continue, including up to such time as Aire Serv may actually obtain a final injunction against further violations, plus two years thereafter. *See* Supp. Reply, at pp. 1–4. Under this reading, as long as the violations are continuous and ongoing, Aire Serv could wait years to bring suit on the covenant not to compete and at the end of such a lawsuit, obtain a two-year injunction against further violations of such covenant. *See id.*

While Aire Serv is correct as a general matter that tolling agreements respecting the duration of covenants not to compete can be enforced under Texas law, to be enforceable such a tolling agreement must be reasonable, just as the overall duration of the covenant not to compete must be reasonable. *Cent. States Logistics, Inc. v. BOC Trucking, LLC*, 573 S.W.3d 269, 276–77 (Tex. Ct. App. 2018); *Cardinal Personnel, Inc. v. Schneider*, 544 S.W.2d 845, 847–48 (Tex. Civ. App. 1976). "A covenant not to compete that extends for an indeterminable amount of time is not reasonable and, as a result, is not enforceable." *Cent. States*, 573 S.W.3d at 277 (citing *Cardinal Personnel*, 544 S.W.2d at 847). In *Cardinal Personnel*, the covenant not to compete was to last six months after the later of the time employment ended or such time as the former employee stopped violating such covenant. *Cardinal Personnel*, 544 S.W.2d at 847. The duration of such a covenant not to compete was "ascertainable only by hindsight" and was therefore "indefinite" and unenforceable. *Id.* Likewise, in *Central States*, the covenant not to compete, made between two businesses, began to run after one

party's "last contact with any client" of the other party to the underlying contract, even if the restrained party had had no interactions with such clients under the contract and regardless of how much time had passed since the contractual relationship ended. *Cent. States*, 573 S.W.3d at 277.[10] As the court in *Central States* observed, such an arrangement "creates the potential for a covenant not to compete that does not end." *Id.*

Aire Serv reads the language "the date on which Franchisee actually ceases operation of the business" as, in effect, indefinitely tolling the two-year term of the covenant not to compete until such time as Joseph stops violating such covenant, whether on his own or under judicial compulsion. Aire Serv's reading falls squarely within the reasoning of the above cases underlying the rule under Texas law that covenants not to compete whose duration cannot be objectively determined *ex ante* are unreasonable and therefore unenforceable as written. *See Cent. States*, 573 S.W.3d at 276–77; *Cardinal Personnel*, 544 S.W.2d at 847–48.

The Texas case on which Aire Serv heavily relies, *Arrow Chem. Corp. v. Pugh*, 490 S.W.2d 628, 633 (Tex. Civ. App. 1972), is earlier than those cited above and is not to the contrary. There, an employer and employee had agreed to a covenant not to compete whose term would "be automatically extended for a period of eighteen (18) months *from the date on which [the employee] permanently ceases such violation [of the covenant not to compete]* or for a period of eighteen (18) months from the date of the entry by a court of competent jurisdiction of a final order . . . enforcing such covenant, whichever period is later." *Id.* at 630 (quoting the contract) (emphasis added). The court in *Arrow Chemical* read the quoted language as limiting the term of the covenant not to compete to the later of "eighteen months from the date of the termination of employment or eighteen months from the date of the entry . . . of a final judgment" and held such a term to be reasonable. *Id.* at 633. The court, however, did not specifically analyze or discuss the italicized portion of the quotation, as such analysis was unnecessary under the facts of that case. The timing of both the events giving rise to the lawsuit and the lawsuit itself apparently removed the need for the former employer to rely on such language to extend the term of the covenant not to compete. *See id.* at 630–31.[11]

While it is possible to read *Arrow Chemical* as approving of covenants not to compete of indefinite duration, such a reading appears overly broad and does not accurately represent the present state of Texas law on this question, any analysis of which must take into account the subsequent cases rejecting an overbroad reading of *Arrow Chemical* and holding that tolling language in a covenant not to compete is unreasonable and unenforceable where such language effectively

---

[10]     The covenant not to compete in *Central States* was also flawed because it failed to provide either party with any reliable way to determine when the covenant not to compete actually began. The restrained party was under no obligation to disclose the identities of persons with which it had contact, but such party also had no access or right of access to the client lists of the other party to the contract. *Cent. States*, 573 S.W.3d at 277 & n.3.

[11]     An alternate explanation, noted by the court in *Cardinal Personnel*, is that the appeal in *Arrow Chemical* was one-sided, *i.e.*, it was briefed and argued only by the appellant who sought to enforce the covenant not to compete via injunctive relief. *See Arrow Chem.*, 490 S.W.2d at 632; *see also Cardinal Personnel*, 544 S.W.2d at 847 n.1. There was also no opinion below explaining why an injunction had not been issued and the former employee had made no evidentiary submissions of his own at trial. *Arrow Chem.*, 490 S.W.2d at 632. Such circumstances counsel against applying the case's holding too broadly, especially in light of intervening cases such as *Cardinal Personnel* which thoroughly analyze the reasonableness of the sort of language present in the Franchise Agreement's covenant not to compete.

renders such covenant's term indefinitely extendable. *See Cent. States*, 573 S.W.3d at 276–77; *Cardinal Personnel*, 544 S.W.2d at 847–48. In addition, the reasoning employed in *Cardinal Personnel* and *Central States* closely resembles the reasoning of the Texas Supreme Court in holding that a similarly-illusory geographic limitation in a covenant not to compete was unreasonable and in fact no limitation at all. *See Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950, 951–52 (Tex. 1960). There, the term of the covenant not to compete was one year, but the covered territory was set by reference to the area in which the former employer might be operating during such term. *Id.* Because the covenant not to compete did not have territorial limits that could be objectively ascertained *ex ante*, "[e]nforcement of the agreement in accordance with its terms would [] effectively prevent [the defendants] from competing with [the plaintiff] anywhere in the world for the stipulated period." *Id.* at 952. This is the same reasoning employed in *Cardinal Personnel* and *Central States* and is equally applicable to the Franchise Agreement's covenant not to compete. Whether the indefinite and therefore illusory terms in a covenant not to compete, which effectively do not act to limit the scope of such covenant, relate to such covenant's geographic or temporal scope does not change the indefinite and unreasonable nature of such terms. *Compare id.* at 951–52 *with Cent. States*, 573 S.W.3d at 276–77; *Cardinal Personnel*, 544 S.W.2d at 847–48.

Thus, Aire Serv's reading of the alleged tolling language in the Franchise Agreement's covenant not to compete, which reading would render a portion of the covenant not to compete unenforceable under applicable nonbankruptcy law, would face significant challenges were the matter to proceed to trial.

Aire Serv's purely equitable arguments for extending the term of the covenant not to compete fare no better. Again, Aire Serv is correct as a general matter that at least some Texas courts recognize the possibility of an equitable extension of the term of a covenant not to compete without its own tolling language based on undue delay in litigating a covenant not to compete, ongoing violations of interim equitable relief *pendente lite* or other similar conduct. *See, e.g.*, *Farmer v. Holley*, 237 S.W.3d 758, 761 (Tex. Ct. App. 2007) (recognizing the possibility of equitable extensions of covenants not to compete based on continuous and ongoing violations, but declining to grant such an extension after balancing the equities); *RenewData Corp. v. Strickler*, Case No. 03-95-00273-CV, 2006 WL 504998, at *5 (Tex. Ct. App. Mar. 3, 2006) (recognizing the possibility of equitable extensions of covenants not to compete based on the delay inherent in litigation, but declining to grant such an extension where the party seeking to enforce the covenant not to compete was the main source of the delay); *see also Sadler Clinic Ass'n v. Hart*, 403 S.W.3d 891, 898–99 (Tex. Ct. App. 2013) (discussing the origin of such equitable extensions in federal case law and noting a potential conflict with one Texas Supreme Court case, but declining to grant such an extension as the facts did not warrant one in any case).

All of the above-cited cases, which are the main authorities on which Aire Serv relies, share something common with the matter at bar—the delay in such cases, as here, was at least in part attributable to conduct by the plaintiff. Here, Aire Serv offers no explanation as to why it waited over a year after the termination of the franchise relationship to bring the Prepetition Suit. Without some explanation, the court will have difficulty concluding that it was necessary or reasonable, or unavoidable, for Aire Serv to take half the length of the term of the covenant not to compete to bring the Prepetition Suit. In other words, without some explanation, any equitable extension of the term of the Franchise Agreement's covenant not to compete would have to be limited to the period after Aire Serv brought the Prepetition Suit, *i.e.*, be under one year in length.

Much of the delay after the Prepetition Suit was filed also appears to have been caused by Aire Serv and does not appear to be the sort of delay inherent to litigation. It is true that Joseph's filing of the Prior Case weeks after Aire Serv brought the Prepetition Suit forced Aire Serv to delay its efforts to enforce the covenants not to compete against Joseph. In the Prepetition Suit, however, as in this adversary proceeding, Aire Serv after commencing litigation did not immediately seek preliminary equitable relief, such as the entry of a temporary restraining order. Further, in the Prior Case, Aire Serv never brought an adversary proceeding or otherwise attempted to pursue Joseph. Aire Serv likewise apparently did not attempt to pursue its legal remedies against Joseph during the month-long gap between the dismissal of the Prior Case and the filing of the Main Case to which the Amended Complaint relates.

Once the Main Case had been filed, Aire Serv waited three weeks before filing the Complaint, even though the Complaint and the Amended Complaint herein are nearly identical to the complaint in the Prepetition Suit. Aire Serv then waited almost three weeks again before bringing the Motion, again without seeking more immediate, preliminary equitable relief. Despite having already filed a similar lawsuit once and having conducted an evidence-gathering investigation during the gap between the Prior Case and the Main Case, Aire Serv simply has not moved quickly in this adversary proceeding in seeking a preliminary injunction. Aire Serv also requested at least one extension of the briefing schedule on the Motion. Further, the Motion, once brought, was filed without the necessary supporting evidence, namely the missing affidavit noted above.

As the court in *RenewData* noted, where a party seeking to enforce a covenant not to compete waited months before bringing suit and was the source of much, but not all, of the delay in the suit it filed, such facts fit well within the old maxim that one who seeks equity must do equity. *RenewData*, 2006 WL 504998, at *5. Where a party seeking to enforce a contractual provision like a covenant not to compete does "not diligently pursue its remedies" thereunder, it would be inequitable for the court to extend the enforceability of the contract, at least to the extent the enforcement delays can be fairly attributed to the party seeking enforcement. *Id.*

Here, while there has been some delay of the sort inherent in litigation, for example, the time originally given for Joseph and Aire Serv to brief the Motion, and this Memorandum Decision has been delayed due to the court's overwhelming caseload, Aire Serv's conduct since the termination of the franchise relationship will make succeeding on this theory at trial very difficult. Given, however, the complexities involved in the above analysis and the possibility, albeit remote, of some extension of the term of the Franchise Agreement's covenant not to compete, the court will examine whether Aire Serv has otherwise established that it has a likelihood of success on the merits under such covenant.

2.    *Aire Serv's Right to Specific Performance of the Franchise Agreement's Covenant Not to Compete in the Franchise Agreement Is a Claim Under the Bankruptcy Code*

In this adversary proceeding, with the exception of the tolling issue discussed above, the question of whether Aire Serv is likely to succeed on the merits under the Franchise Agreement's covenant not to compete does not turn on the usual sorts of nonbankruptcy law issues presented in a suit on such a covenant, such as the validity and enforceability of such a covenant under nonbankruptcy law. Here, Joseph has generally conceded that the Franchise Agreement's covenant not to compete is valid and enforceable under applicable nonbankruptcy law. Resp., at p. 5. Joseph has also conceded that the business he is currently operating "likely violates the [Franchise

Agreement's] noncompete agreement and as such [Aire Serv] has a likelihood of success on the merits" of its claims under the Franchise Agreement and applicable nonbankruptcy law. *Id.* In other words, setting aside the gating question raised by the court regarding the term of the Franchise Agreement's covenant not to compete, Joseph agrees that Aire Serv will likely be able to show that Joseph is in violation of such covenant postpetition. *See id.*[12]

Nevertheless, despite the above concessions, Joseph contends that the claims asserted by Aire Serv in the Amended Complaint all constitute "claims" within the meaning of section 101(5)(B) of the Bankruptcy Code and that Aire Serv must raise such claims by filing a proof of claim in the underlying bankruptcy case, not via an adversary proceeding. *See id.* at pp. 2–4. For the reasons set forth more fully below, Aire Serv's claims under the Franchise Agreement's covenant not to compete do constitute claims within the meaning of section 101(5)(B) and Aire Serv is therefore not likely to succeed on the merits of the Amended Complaint.

Section 101(5)(B) of the Bankruptcy Code defines a claim to include a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5)(B). The Supreme Court explained that Congress desired the definition of a claim under section 101(5) to apply broadly. *Ohio v. Kovacs*, 469 U.S. 274, 279 (1985); *see also, e.g., In re Kimball Hill, Inc.*, 565 B.R. 878, 896 (Bankr. N.D. Ill. 2017) (Barnes, J.) (definition of claim under section 101(5) is "very broad"). At issue in *Kovacs* was whether the state of Ohio had a claim under the Bankruptcy Code based on an obligation owed to the state for the clean-up of certain hazardous waste under a prepetition injunction. *See Kovacs*, 469 U.S. at 279. Because the obligation could be satisfied in full by the payment of money as an alternative to requiring the debtor to perform under the injunction, and the right to money damages and the right to the injunction arose out of the same breach, the pollution, the state had a claim under section 101(5)(B). *Id.*

The Seventh Circuit has specifically addressed whether a right to injunctive relief to enforce a covenant not to compete constitutes a claim in *In re Udell*, 18 F.3d 403 (7th Cir. 1994). *See also Kennedy v. Medicap Pharmacies, Inc.*, 267 F.3d 493, 495–98 (6th Cir. 2001) (following *Udell*). There, guided by *Kovacs*, the Seventh Circuit held that the right to a prospective injunction to enforce a covenant not to compete was not a claim under section 101(5)(B) and could thus be enforced prospectively in a postpetition adversary proceeding against the debtor where the covenant not to compete at-issue provided for capped liquidated damages of $25,000 *in addition to* a right to seek equitable relief. *Udell*, 18 F.3d at 406–09.

The *Udell* decision turned on just that, that the covenant not to compete gave rise to a right to specific performance *and* damages. *Id.* The court reasoned that a right to an equitable remedy

<hr />

[12]    Even without Joseph's concessions, the Dotson Affidavit and the documentary evidence submitted by Aire Serv, all of which appears to relate to either the validity and enforceability of the covenants not to compete or the breach thereof, appear sufficient, in the context of a preliminary injunction proceeding, for the court to determine that Aire Serv is likely to succeed in demonstrating that the covenant not to compete in the Franchise Agreement is valid and enforceable and that Joseph is operating his business in violation of such covenant.

constitutes a claim under section 101(5)(B) where performance *or* payment could be sought based on the same breach that gives rise to the equitable right, but not both. *Id.* at 407.

*Udell* is based in large part on the Seventh Circuit's reading of the express language of section 101(5)(B) itself, which defines a claim in this instance as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(B). The Seventh Circuit's conceptualization of concordant versus mutually exclusive remedies is not, however, found anywhere in the statute and *Udell* has been criticized for just this reason. *See, e.g.,* Daniel J. Bussel, *Doing Equity in Bankruptcy*, 34 Emory Bankr. Dev. J. 13, 42–44 (2017) (discussing the main criticism of *Udell*, outlining the competing view of section 101(5)(B) and collecting cases); *see also Udell*, 18 F.3d at 412 (the concurring opinion in *Udell*).

*Udell* involved the following remedial provision in a covenant not to compete: "In the event of [the debtor]'s actual or threatened breach of the provisions of this [covenant], [his employer] shall be entitled to an injunction restraining [him] as well as reimbursement for reasonably [sic] attorneys fees incurred in securing said judgment and stipulated damages in the sum of $25,000.00." *Udell v. Standard Carpetland USA, Inc.*, 149 B.R. 908, 909 (N.D. Ind. 1993) (quoting the contract) (internal quotation marks omitted), *rev'd sub nom. In re Udell*, 18 F.3d 403 (7th Cir. 1994). The Seventh Circuit read the above provision as establishing a right to liquidated damages that was cumulative to and coexisted with the right to an injunction thereunder. *Udell*, 18 F.3d at 407–09. The injunction covered threatened future violations of the covenant not to compete, but separate from that right to equitable relief, the employer was also entitled to receive a predetermined amount of money damages. *Id.* Accordingly, the right to the injunction was not a claim under the Bankruptcy Code because the right to payment arising from the same breach was not an alternate remedy to the injunction, but independent from and cumulative with the right to equitable relief. *Id.*

Thus, under *Udell* the right to an equitable remedy to enforce a covenant not to compete constitutes a claim under section 101(5)(B) when the obligation to perform under such covenant can be satisfied by the payment of money damages in lieu of injunctive relief or when any such right to money damages exists purely an alternative remedy to, and is not cumulative with, any such right to equitable relief. *Id.*

Here, the covenant not to compete in the Franchise Agreement expressly provides for liquidated damages only as an alternative remedy to injunctive relief and thus Aire Serv's right to injunctive relief constitutes a claim under section 101(5)(B) and the reasoning in *Udell*. Specifically, the liquidated damages provision in the Franchise Agreement's covenant not to compete provides that "[i]f Franchisor establishes that Franchisee has violated the material terms of this Section 9 [the covenant not to compete] and such provisions are not enforceable by equitable relief for any reason, Franchisee agrees that Franchisor will incur certain damages . . . ." Franchise Agreement, at p. 20. This language makes monetary damages an alternative to equitable relief to enforce the covenant not to compete.

The structure of the liquidated damages provision in *Udell*, as compared to the one here, further illustrates the difference. In *Udell*, the applicable liquidated damages were clearly not calculated as recompense for the breach as a whole. *Udell*, 18 F.3d at 409. In contrast, the covenant not to compete in the Franchise Agreement here is just as clearly structured with liquidated damages designed to compensate for the entire breach. The Franchise Agreement states that "in such event, Franchisee shall pay to Franchisor, as liquidated damages and not as a penalty, a sum of money equal

18

to 104 times the largest weekly License Fee paid . . . during the term of th[e Franchise] Agreement." Franchise Agreement, at p. 20.

The amount of liquidated damages under the Franchise Agreement is calculated as the product of two factors: *first*, 104—the number of weeks in two years which is the term of the covenant not to compete; and *second*, the largest weekly fee actually paid by JSR to Aire Serv during the term of the franchise, which fee is calculated as a percentage of gross receipts. *See id.*, Exh. 1A, at p. 3 (defining license fee). The formula, based on the length of the covenant not to compete and historical data regarding licensing fees paid to Aire Serv during the franchise term, appears intended to provide a reasonable forecast of damages to compensate Aire Serv for losses incurred over the term of the covenant not to compete if Aire Serv cannot obtain equitable relief. Such differences in the calculation and amount of liquidated damages further confirm what the contractual language expressly states—that Aire Serv's right to monetary relief under the Franchise Agreement—the liquidated damages—is not cumulative with, but rather is an alternative to, the right to equitable relief thereunder.

The *Udell* standard remains, to this day, the standard for considering whether a covenant not to compete is a claim in bankruptcy—both inside and outside of this Circuit. *See, e.g., In re Gacharna*, 480 B.R. 909, 911–13 (Bankr. N.D. Ill. 2012) (Cox, J.) (applying *Udell* and holding that the right to specific performance of a covenant not to compete was not a claim where the agreement did not provide for an alternate damages remedy for the breach of such covenant); *Outdoor Media Grp., Inc. v. Love (In re Love)*, Case No. 00-83615, 2001 WL 34076354, at *4–5 (Bankr. C.D. Ill. Mar. 9, 2001) (similar); *see also, e.g., MCS Acquisition Corp. v. Gilpin (In re Gilpin)*, Case No. 07-8031, 2008 WL 2787520, at *4–5 (6th Cir. B.A.P. July 17, 2008) (collecting cases); *Kennedy*, 267 F.3d at 495–98. That is the case despite the considerable criticism of *Udell* noted above. Bussel, *supra*, at 42–44; *see also, e.g., Maids Int'l, Inc. v. Ward (In re Ward)*, 194 B.R. 703, 713–14 (Bankr. D. Mass. 1996). These authorities, and other cases outside this Circuit that apply *Udell* to facts not involving covenants not to compete, seem to adopt, in keeping with *Kovacs*, a more expansive view whether equitable rights are claims in bankruptcy. *See, e.g., Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 35–37 (1st Cir. 2009); *Air Line Pilots Ass'n v. Cont'l Airlines (In re Cont'l Airlines)*, 125 F.3d 120, 134–36 (3d Cir. 1997).

That being stated, the court notes that more recent decisions from the Seventh Circuit, in accord with some cases from outside this Circuit, seemed to adopt just such a more expansive view. *See, e.g., In re LaMont*, 740 F.3d 397, 408 n.15, 409 (7th Cir. 2014) (citing *Udell* but holding that the right to equitable relief held by a tax purchaser under the Illinois tax sale scheme was a claim because such tax purchaser also had right to payment that was cumulative with, not alternative to, its right to equitable relief). Under the reasoning set forth in *LaMont* as extrapolated to the question presented here, covenants not to compete would be considered claims if there existed also a right to liquidated damages, whether or not the rights were concordant or mutually exclusive.

Whether it be on under the narrower conceptualization of claims in *Udell* or the broader one in *Kovacs, LaMont, Rederford* and *Continental Airlines*, what is clear is that in bankruptcy, the Franchise Agreement's covenant not to compete gives rise to a claim, not a right of specific enforcement. As Aire Serv has an alternate right to money damages to enforce the covenant not to compete in the Franchise Agreement, the injunctive relief Aire Serv seeks for Joseph's alleged violation of such covenant is a claim under the *Udell* and Aire Serv must pursue such equitable relief as a claim in the Main Case, not in this adversary proceeding.

As Aire Serv has an alternate right to money damages to enforce the covenant not to compete in the Franchise Agreement, the injunctive relief Aire Serv seeks for Joseph's alleged violation of such covenant not to compete is a claim under the Bankruptcy Code and Aire Serv must pursue such claim for equitable relief in the Main Case, not through the Amended Complaint in an adversary proceeding.

C.   The Confidentiality Agreement's Covenant Not to Compete

Aire Serv has also brought suit against Joseph on the covenant not to compete in the Confidentiality Agreement, *see* Am. Compl., at pp. 10–13, but that covenant not to compete differs in material respects from the covenant not to compete in the Franchise Agreement. *Compare* Franchise Agreement, at p. 20 *with* Confidentiality Agreement, at p. 2. For example, the covenant not to compete in the Confidentiality Agreement does not contain any liquidated damages provision and does not expressly incorporate the liquidated damages provision in the Franchise Agreement's covenant not to compete. *See* Confidentiality Agreement, at p. 2.[13] As such, it does not appear that Aire Serv's equitable remedies under the Confidentiality Agreement's covenant not to compete would be considered claims, either under *Udell* or the less restrictive case law.

Aire Serv also cannot succeed on this theory, however, for an entirely different reason.

In construing a written contract, the court must ascertain the intentions of the parties as expressed in the agreement—by examining the language used by the parties in the contract. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Individual provisions must be considered in the context of the entire document and multiple contracts relating to the same transaction must be considered and construed together. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (parts of a contract considered with reference to each other and to the whole); *Fort Worth Independent Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (construing multiple contracts relating to the same transaction together).

The language used by the parties in the Confidentiality Agreement provides in pertinent part that "for a period of two (2) years . . . *Associate shall not* . . . own, maintain, operate, or engage or participate in, or have any financial interest . . . in any . . . entity which engages in any business which is the same or similar to the Franchise[] or is otherwise in competition with the business of Franchisor or Franchisor's geographical area . . . ." Confidentiality Agreement, at p. 2 (emphasis added). The Confidentiality Agreement defines "Associate" to mean Dorothy and uses "Franchisee" as the defined term for Joseph. *Id.* at p. 1. Thus, the operative language of the Confidentiality Agreement's covenant not to compete applies only to Dorothy (Associate) and does not impose any duties or obligations on Joseph (Franchisee). The triggering language in the Confidentiality Agreement's covenant not to compete further reinforces this reading by providing that the covenant not to compete will come into effect on "the earlier of the termination of the Franchise Agreement or the date on which Associate [Dorothy] ceases to be associated with Franchisee [Joseph] . . . , whether because of the later to occur of a termination of an employment arrangement or marriage . . . ." *Id.* at p. 2.

---

[13]   Aire Serv and Joseph have addressed some of those differences in the supplemental briefing discussed in more detail in Part B above. *Compare* Supp. Reply, at pp. 2–3, *with* Supp. Resp., at pp. 2–4.

Looking at these provisions in the context of the entire Confidentiality Agreement, these provisions fair no better. The other operative provisions therein besides the covenant not to compete all appear to impose duties on Dorothy individually and give rights to Aire Serv with respect to Dorothy alone. *See, e.g., id.* at p. 1 (providing that "Associate hereby agrees to be bound by [certain] provisions of the Franchise Agreement[,]" "Associate agrees not to use Confidential Information[,]" and "Associate agrees not to disclose, communicate or divulge any Confidential Information for Associate's benefit or for the benefit of any other third party . . . .").

Finally, the Confidentiality Agreement was but one contract in a group of many executed together as part of the renewal of the franchise relationship underlying the Amended Complaint and the Confidentiality Agreement therefore must be read and understood in the context of all the documents governing the transaction. In addition to the Confidentiality Agreement under which Aire Serv has sued Joseph, there was a second, extremely similar confidentiality agreement executed by Mary, the wife of Joseph's business associate Earl, governing her relationship with Aire Serv, but not imposing new or different duties or obligations on Earl himself. *See* Franchise Agreement, Exh. 7B. The second confidentiality agreement contains the same operative language discussed above and appears to apply to Mary in the same manner the Confidentiality Agreement applies to Dorothy. *See id.* at pp. 1–2. Moreover, the terms of the Franchise Agreement itself, including the arguably-broader covenant not to compete therein, apply fully both to Joseph and Earl by virtue of the Guaranty. *See* Franchise Agreement, at p. 36. Reading the Confidentiality Agreement's covenant not to compete to impose a second set of obligations not to compete on Joseph not only would be contrary to the plain language of the Agreements but also would make little to no sense in light of the independent, and arguably more stringent, obligations not to compete already imposed on Joseph under the Guaranty and the Franchise Agreement.

Aire Serv has not brought suit against Dorothy and has presented no evidence and made no allegations that Dorothy is violating or has violated the covenant not to compete in the Confidentiality Agreement. As Aire Serv likely does not have a claim or cause of action against Joseph under the Confidentiality Agreement's covenant not to compete, because such covenant by its terms does not apply to Joseph or impose any obligation not to compete on Joseph, Aire Serv is unlikely to succeed on the merits of its claim for a permanent injunction against Joseph to enforce the covenant not to compete in the Confidentiality Agreement.[14]

Aire Serv has, therefore, failed to establish a likelihood of success on the merits of the Amended Complaint under the Confidentiality Agreement's covenant not to compete.

D.      Irreparable Harm and Inadequate Remedy at Law

Aire Serv has also failed to submit sufficient evidence to succeed on the remaining two elements on which Aire Serv has the initial burden.

---

[14]      Even if the Confidentiality Agreement could be read to apply to Joseph as well as Dorothy, such a reading would likely necessitate applying the liquidated damages provision in the Franchise Agreement's covenant not to compete to Joseph's obligations not to compete under the Confidentiality Agreement as well, to reconcile the potentially conflicting or at best inharmonious remedies therein. Reading the Confidentiality Agreement by its plain terms to impose obligations not to compete on Dorothy alone obviates the need to complicate what are otherwise clear contractual provisions.

It is true that courts often appear to assume the irreparability of injuries such as the loss of goodwill and other harms typically occasioned by violations of a covenant not to compete, usually based on the difficulty of calculating damages therefor. Nevertheless, for the court to grant a preliminary injunction, the court still needs at least some proof that such harm will occur or continue to occur while the lawsuit pending if no preliminary injunction issues. *See, e.g., Mazurek,* 520 U.S. at 972; *Camenisch,* 451 U.S. at 395. Mere allegations that a defendant is continuing to engage in particular activity that harms a plaintiff-franchisor, such as the ongoing use of proprietary assets, will not suffice without at least some proof of such harms themselves in addition to evidence of the conduct violating the covenant not to compete. *See, e.g., Baskin-Robbins Inc. v. Patel,* 264 F. Supp. 2d 607, 612 (N.D. Ill. 2003).

Here, Aire Serv's submissions on the elements of irreparable harm and inadequate remedy at law consisted entirely of argument and allegations without any independent evidence that the ongoing violation of the covenants not to compete by Joseph would result in the sorts of harms alleged while this adversary proceeding remains pending. *See* Mot., at pp. 11–13. In particular, Aire Serv failed to submit the missing Truett affidavit upon which the Motion relied as evidence of the harms alleged. That failure left Aire Serv with essentially no meaningful evidentiary submissions as to irreparable harm and the inadequacy of legal remedies. The Dotson Affidavit and the remaining documentary evidence related to proving up Joseph's violation of the covenants not to compete or to the breakdown of the franchise relationship before Aire Serv terminated such relationship. Without at least something more in the way of evidentiary submissions on the existence of harm *pendente lite,* Aire Serv's submissions are insufficient to demonstrate that facts, such as the ongoing use of marks in dealings with the public, are present here. Such facts, if properly supported by evidence, could allow the court to assume both the existence of harm and the irreparability of that harm based only on evidence of the violation of the covenants not to compete, if such an assumption is ever permissible. *See, e.g., Baskin-Robbins,* 264 F. Supp. at 607–08.

Accordingly, Aire Serv has failed to establish that it will suffer irreparable harm *pendente lite* or that it lacks an adequate remedy at law, in addition to having failed to establish a likelihood of success on the merits under the covenants not to compete in the Franchise Agreement and the Confidentiality Agreement. The Motion is therefore not well taken and the court declines to issue a preliminary injunction in favor of Aire Serv.

## CONCLUSION

Aire Serv has not shown that it is likely to succeed on the merits of the Amended Complaint under either the covenant not to compete in the Franchise Agreement or the covenant not to compete in the Confidentiality Agreement, that it will, without a preliminary injunction, suffer irreparable harm while the Amended Complaint remains is pending or that its legal remedies are inadequate. Accordingly, Aire Serv has not satisfied its initial burden its request for a preliminary injunction.

For all of the foregoing reasons and by separate order entered concurrently herewith, the Motion will be denied and no preliminary injunction will issue.

Dated: October 10, 2019                              ENTERED:

Timothy A. Barnes
United States Bankruptcy Judge